**SHREE RAMA ENTERPRISES, Calcutta Ferrous Ltd., Siko Exports, Kajaria Iron Castings Pvt. Ltd., Crescent Foundry Co. Pvt. Ltd., Dinesh Brothers, Kejriwal Iron & Steel Works, R.B. Agarwalla & Co., Rsi Ltd., and Serampore Indus. Pvt. Ltd., Plaintiffs,**

v.

**UNITED STATES, Defendants,**

**Alhambra Foundry, Inc., Allegheny Foundry Co., Bingham & Taylor Div., Virginia Indus., Inc., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., Lebaron Foundry, Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Tyler Pipe Indus., Inc., U.S. Foundry & Mfg. Co., and Vulcan Foundry, Inc., Defendants–Intervenors.**

**Slip Op. 97–148.**
**Court No. 97–07–01099.**

United States Court of International Trade.

Nov. 7, 1997.

---

**193**

Cameron & Hornbostel (Dennis James, Jr.), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau) and Robert E. Nielsen, Senior Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Collier, Shannon, Rill & Scott (Mary T. Staley), Washington, DC, for defendant-intervenor.

## MEMORANDUM OPINION

DiCARLO, Senior Judge.

Plaintiffs have moved for a preliminary injunction to prevent the collection of countervailing duty deposits at the new company-specific rates published in *Certain Iron–Metal Castings from India*, 62 Fed.Reg. 32,297 (Dep't Commerce 1997) (final admin. review) [hereinafter *Final Determination*]. Plaintiffs are asking the court to preserve the former country-wide rate of 5.13% pending judicial review of the *Final Determination*. Because plaintiffs have not demonstrated that they will be irreparably harmed by the new deposit rates, their motion is denied.

## BACKGROUND

Until passage of the Uruguay Round Agreements Act of 1994, Commerce routinely set a single country-wide countervailing duty rate, although it could, and often did, assign individual rates to particular exporters. 19 U.S.C. § 1671e(a)(2) (1988); *see, e.g., Certain Iron Metal Castings from India*, 60 Fed. Reg. 44,849 (Dep't Commerce 1995) (final admin. review). The 1994 Act reversed this practice, creating a general rule in favor of individual company-specific rates. *Cf.* 19 U.S.C. §§ 1671d(c), 1677f–1(e) (1994) *with* 19 U.S.C. §§ 1671d(c)(1), 1671e(a)(2) (1988). Although individual rates are not a new invention, plaintiffs argue that this change has created a "new dynamic in the import marketplace[,]" and that the deposit rate has become a determining factor in U.S. importers' purchasing decisions. (Pls.' Br. at 3.) This dynamic is nothing new. Foreign producers have always competed with fellow exporters assigned significantly lower individu-

al deposit rates. Nevertheless, plaintiffs claim that as a result of the change in the law they are threatened with the immediate loss of long-standing customers to other Indian producers with lower deposit rates.

## DISCUSSION

### I.

■ As a preliminary matter, the court finds that it has the authority to rule on the plaintiffs' motion. The court has jurisdiction under 28 U.S.C. § 1581 (1994). It is unnecessary to specify whether § 1581(c) or § 1581(i) applies, as the court is not granting the requested relief. *See Shakeproof Indus. Products Div. of Illinois Tool Works, Inc. v. United States,* 104 F.3d 1309, 1313–14 (Fed. Cir.1997); *Hylsa, S.A. de C.V. v. United States,* 21 CIT ——, ——, 960 F.Supp. 320, 324–25 (citing *Shakeproof Indus. Products* ), *appeal dismissed,* 113 F.3d 1255 (Fed.Cir. 1997). In exercising that jurisdiction, the Court of International Trade possesses "all the powers in law and equity of . . . a district court of the United States." 28 U.S.C. § 1585 (1994). These include "broad injunctive powers." *NTN Bearing Corp. of America v. United States,* 892 F.2d 1004, 1006 (Fed.Cir.1989); 28 U.S.C. § 2643(c)(1) (1994).

Defendant claims that this court has no jurisdiction over the administrative handling of entries before a final court decision, except to temporarily suspend liquidation of duties. The argument relies on *NTN,* which vacated an injunction ordering a refund and forbidding further collection of estimated dumping duties after a partial summary judgment. *Id.* Under *NTN,* the court may not order liquidation at a rate other than that set in the challenged determination until after a final court decision, although it may suspend liquidation pending judicial review. *Id.* at 1006 (citing 19 U.S.C. § 1516a(c)(2), 1516a(e) (1988)).

*NTN* does not limit this court's jurisdiction. Its holding affects the timing of liquidation, not the court's power to issue injunctions in appropriate circumstances. There have been post-*NTN* cases in which the court has considered motions to enjoin collection of cash deposits. In all instances, the court has

found jurisdiction to consider the motion. *Queen's Flowers de Colombia v. United States,* 20 CIT ——, 947 F.Supp. 503 (1996) (motion granted); *Companhia Brasileira Carbureto de Calcio v. United States,* 18 CIT 215 (1994) (citing *NTN* but finding it did not prohibit extraordinary injunctive relief) (motion denied); *Chilean Nitrate Corp. v. United States,* 11 CIT 538 (1987) (motion denied). There is no reason to reach a different conclusion here. Given the court's broad authority, the "former significance [of a specific provision for suspending liquidation] cannot be limiting. . . . [I]t represents simply a particularization of relief available in one important phase of judicial review." *Krupp Stahl AG v. United States,* 4 CIT 244, 246, 553 F.Supp. 394, 396 (1982). "[E]xclusions to the Court's powers are directly and unambiguously stated in 28 U.S.C. § 2643(c)(1)." *Id.* This court retains all powers of a district court not specifically excluded there.

### II.

■ While the court has the power to enjoin collection of deposits at the new rates, plaintiffs have not established that they are entitled to injunctive relief. To obtain a preliminary injunction, petitioners must show: 1) that they will be "immediately and irreparably injured," 2) that there is a "likelihood of success on the merits," 3) that the relief requested is in the public interest, and 4) that the "balance of hardship on all parties favors the petitioner." *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir. 1983). If plaintiffs fail to prove any one of these factors, their motion will fail.

■ Plaintiffs have not shown that they are threatened with immediate and irreparable injury. Irreparable harm is serious harm that cannot be undone. *Id.* (citing *S.J. Stile Assoc. Ltd. v. Snyder,* 68 C.C.P.A. 27, 646 F.2d 522, 525 (C.C.P.A.1981)). In evaluating that harm, the court must consider "the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief." *Queen's Flowers,* 20 CIT at ——, 947 F.Supp. at 506. It is not enough to establish "a mere possibility of injury, even where prospective injury is great. A pres-

ently existing, actual threat must be shown." *Zenith*, 710 F.2d at 809.

Plaintiffs' allegation of irreparable harm is identical to the claim raised in *Chilean Nitrate*, which alleged "significant and permanent monetary injury as a consequence of posting large cash deposits[.]" *Chilean Nitrate*, 11 CIT at 540. In support of their claim, six of the eight plaintiffs submitted affidavits describing the anticipated effect of increased deposit rates. According to the affidavits, the new rates will affect between 59 and 81 percent of plaintiffs' sales revenues. The affidavits include customer letters and descriptions of conversations with customers in which the customers state that they have switched or will switch suppliers rather than pay the higher deposit rate. Plaintiffs believe that if customers do so, several exporters will be eliminated from the U.S. market for both subject and nonsubject castings.

Plaintiffs' proof is insufficient. While the court need not create a bright-line rule defining the level of harm that would merit an injunction, it is safe to say that the threshold is high and will be very difficult to cross. In *Queen's Flowers*, petitioners showed that higher deposit rates threatened them with "immediate economic extinction." *Queen's Flowers*, 20 CIT at ——, 947 F.Supp. at 507. Here, plaintiffs' affidavits do not even contend that they are in danger of bankruptcy. Furthermore, even if they did claim a threat of extinction, affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction. Plaintiffs submitted no evidence from independent sources, and produced no witnesses available for cross-examination at the preliminary injunction hearing. "No marketing studies, written financial data or other hard evidence of the serious permanent harm which would result from denial of the injunction was presented." *Chilean Nitrate*, 11 CIT at 541. If the court were to grant plaintiffs' motion on so little documentary evidence, it would essentially be holding that any substantial increase in deposit rates before a final court decision constitutes irreparable harm *per se*. Future petitioners would be able to forestall the application of new deposit rates in many, if not most, antidumping or countervailing duty determinations contested in court.

A similar debate originally surrounded injunctions suspending liquidation. In *Zenith Radio Corp.*, this court denied a motion to suspend liquidation, holding that liquidation prior to a final court decision is not "irreparable harm *per se*" and that preliminary injunctions "should not be routinely granted." *Zenith Radio Corp. v. United States*, 4 CIT 217, 218–19, 553 F.Supp. 1052, 1053–54 (1982), *rev'd*, 710 F.2d 806 (Fed.Cir.1983). The Federal Circuit reversed, declaring that "the consequences of liquidation do constitute irreparable injury[,]" as liquidation would "eliminate the only remedy available to [petitioners] for an incorrect review determination." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed.Cir.1983). There is no statutory provision permitting imposition of higher duties after liquidation if petitioners are successful on the merits. After liquidation, therefore, judicial review can provide no tangible benefit. *Id.* at 810.

As a result of the *Zenith* decision, this court now routinely grants motions to suspend liquidation pending judicial review. Plaintiffs seem to be arguing that under the "new dynamic" created by the Uruguay Round Agreements Act, alterations in deposit rates have become *per se* irreparable harm, and should also routinely be suspended. There is no evidence that Congress intended such a result. Currently, there is no standard practice of delaying the application of new deposit rates; plaintiffs have cited only one instance in which it has ever occurred. *Queen's Flowers*, 20 CIT ——, 947 F.Supp. 503 (unique circumstances threatened petitioners with irreparable harm: shift in deposit rate from 0.00–3.13% to 76% would bankrupt petitioners within weeks). Granting plaintiffs' motion would in all likelihood create such a practice, radically altering the impact of litigation on the collection of import duties. The court is not inclined to find irreparable harm on the basis of these affidavits alone when the consequences of that finding would have such far-reaching implications.

Since plaintiffs have failed to establish irreparable harm, it is not necessary to discuss

the remaining three factors in depth. "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial [of an injunction]." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). In this case, plaintiffs' insufficient proof of injury would not be outweighed by the strength of their showing regarding the other three factors, *see id.,* even assuming a likelihood of success on the merits and a balance of hardships in plaintiffs' favor. Even if the court had found irreparable harm, it is not at all clear that in this case such a finding would have outweighed the public interest in protecting the government from default. That interest was expressed in Congress' directive requiring "a cash deposit, bond, or other security" for every entry of merchandise subject to a countervailing duty order. 19 U.S.C. § 1671d(c)(1)(B)(ii) (1994). "[P]aying deposits pending court review is an ordinary consequence of the statutory scheme." *MacMillan Bloedel Ltd. v. United States,* 16 CIT 331, 333 (1992). Accordingly, plaintiffs' motion is denied.

## ORDER

Upon consideration of plaintiff's motion for a preliminary injunction enjoining collection of deposits at the rates published in *Certain Iron–Metal Castings from India,* 62 Fed. Reg. 32,297 (Dep't Commerce 1997) (final admin. review), after oral argument, and upon consideration of all other papers submitted, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

